UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| GREGORY C. WEHRHAHN | : | |
| | : | |
| v. | : | CIV. NO. 3:13CV708 (HBF) |
| | : | |
| CAROLYN W. COLVIN, | : | |
| ACTING COMMISSIONER, | : | |
| SOCIAL SECURITY | : | |
| ADMINISTRATION | : | |
| | : | |

**RECOMMENDED RULING ON CROSS MOTIONS**

Plaintiff Gregory Wehrhahn brings this action pursuant to
§§ 205(g) and 1631(c)(3) of the Social Security Act ("the Act"),
as amended 42 U.S.C. §§ 405(g) and 1383(c)(3), to review a final
decision of the Commissioner of Social Security (the
"Commissioner") denying plaintiff's application for Disability
Insurance Benefits ("DIB") and Supplemental Security Income
("SSI"). Plaintiff has moved to reverse the Commissioner's
decision [Doc. #21], while the Commissioner has moved to affirm.
[Doc. #24].[1]

For the reasons set forth below, plaintiff's Motion for
Order Reversing the Decision of the Commissioner or in the
Alternative Motion for Remand for a Hearing [Doc. #21] is

---

[1] The Court considered Plaintiff's Memorandum in Support of Plaintiff's
Motion for Order Reversing the Decision of the Commissioner or in the
Alternative Motion for Remand for a Rehearing [Doc. #21-2], Defendant's
Memorandum in Support of Motion for an Order Affirming the Commissioner's
Decision [Doc. #24-1], and Plaintiff's Reply Memorandum in Response to
Defendant's Motion for Order Affirming the Decision of the Commissioner [Doc.
#27].

**DENIED**. Defendant's Motion for an Order Affirming the Commissioner's Decision [Doc. #24] is **GRANTED**.

## I.    ADMINISTRATIVE PROCEEDINGS

Plaintiff filed applications for DIB and SSI on April 8, 2010, alleging disability as of February 10, 2008. (Certified Transcript of the Record, Dated July 1, 2013, (hereinafter "Tr.") 168-171, 172-179). Plaintiff later amended his alleged onset date to March 1, 2010. [Tr. 39]. Plaintiff's date of last insured is December 31, 2013. [Tr. 62]. His DIB and SSI claims were denied initially on September 10, 2010, [Tr. 62-73, 74-85], and, upon reconsideration, on October 20, 2010. [Tr. 88-99, 100-111].

Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ") on November 30, 2010. [Tr. 126]. On December 13, 2011, ALJ James E. Thomas held a hearing at which plaintiff was represented by counsel, and vocational expert Dr. Jeffrey Blane testified. [Tr. 34-59]. On January 27, 2012, the ALJ issued an unfavorable decision, finding that plaintiff was not disabled, and denied his claims. [Tr. 12-33].

On April 4, 2013, the Appeals Council denied review, thereby rendering ALJ Thomas's decision the final decision of the Commissioner. [Tr. 1-6]. The case is now ripe for review under 42 U.S.C. §405(g).

## II.   LEGAL STANDARDS

### A.   Standard of Review

This Court's review of the Commissioner's decision is limited to determining whether the ALJ's conclusions were based on proper legal standards and supported by substantial evidence in the record. See 42 U.S.C. § 405(g); Yancey v. Apfel, 145 F.3d 106, 110–11 (2d Cir. 1998). In reviewing an ALJ's decision, the court considers the entire administrative record. See Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). The court's responsibility is to ensure that a claim has been fairly evaluated. See Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983).

"Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1987) (quoting Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)). However, "(w)here application of the correct legal standard could lead only to one conclusion, we need not remand." Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998) (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)).

Substantial evidence is evidence that "a reasonable mind

might accept as adequate to support a conclusion"; it is more than a "mere scintilla." See Richardson v. Perales, 402 U.S. 389, 401 (1971); Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). To enable a reviewing court to decide whether a decision is supported by substantial evidence, the ALJ must set forth "the crucial factors in any determination . . . with sufficient specificity." See Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). However, it is not necessary to "explicitly reconcile every conflicting shred of medical testimony." Mongeur v. Heckler, 722 F. 2d 1033, 1040 (2d Cir. 1983).

"Thus, as a general matter, the reviewing court is limited to a fairly deferential standard." Gonzalez ex rel. Guzman v. Commissioner, 360 Fed. Appx. 240, 242 (2d Cir. 2010) (summary order) (citing Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998)). If the decision of the ALJ evinces legal error or is unsupported by substantial evidence, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**B.   The Required Procedure**

To be considered disabled and therefore entitled to benefits, Mr. Wehrhahn must demonstrate that he is unable to work after a date specified "by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also 1382c(a)(3)(A). Such impairment or impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." See id. § 423(d)(2)(A); see also 20 C.F.R. §404.1520(c) (requiring that the impairment "significantly limit ( ) . . . physical or mental ability to do basic work activities" to be considered "severe").

There is a familiar five-step analysis used to determine if a person is disabled. See 20 C.F.R. §404.1520. In the Second Circuit, the test is described as follows:

> First, the (Commissioner) considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the (Commissioner) next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the (Commissioner) will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally,

> if the claimant is unable to perform his past work,
> the (Commissioner) then determines whether there is
> other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry
v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam))
(alterations in original).

Through the fourth step, "the claimant carries the burdens
of production and persuasion, but if the analysis proceeds to
the fifth step, there is a limited shift in the burden of proof
and the Commissioner is obligated to demonstrate that jobs exist
in the national or local economies that the claimant can
perform," given what is known as her "residual functional
capacity." See Gonzalez, 360 Fed. Appx. at 243 (citing Poupore
v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam)).
"Residual functional capacity" is what a person is still capable
of doing despite limitations resulting from his physical and
mental impairments. See 20 C.F.R. § 416.945(a).

If a claim reaches the fifth step, the Commissioner may use
the Medical Vocational Guidelines, (commonly referred to as the
"Grid"), which allow the Commissioner to take into account the
claimant's RFC in addition to her age, relevant work experience,
and education. 20 C.F.R. Part 404, Subpart P, App. 2. See also
Kara v. Apfel, 11 F. Supp. 2d 375, 380 (S.D.N.Y. 1998); 20
C.F.R. § 404.1545(a). When the Grid does "not fully account for
the claimant's limitations, the Commissioner must utilize other

evidence, such as the testimony of a vocational expert," to determine if the claimant is capable of performing work which is available in significant numbers in the national economy. <u>Taylor v. Barnhart</u>, 83 F. Appx. 347, 350 (2d Cir. 2003) (summary order).

### III. ALJ'S DECISION

Following the prescribed five step analysis, ALJ Thomas concluded that plaintiff was not disabled under the Social Security Act from March 1, 2010, his alleged onset date, to January 27, 2012, the date of the ALJ's decision. [Tr. 28].

At step one, the ALJ found that plaintiff has not engaged in substantial gainful activity since March 1, 2010, the alleged onset date. [Tr. 18]. At step two, the ALJ found that plaintiff suffered from the following severe impairments: affective disorder and substance abuse disorder. <u>Id.</u>

At step three, the ALJ found that plaintiff's impairments met the requirements of Listings 12.04 (affective disorders) and 12.09 (substance addiction disorders) of 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ found that plaintiff's impairments were considered listing-level because plaintiff satisfied both the "A" and "B" requirements of Section 12.04. [Tr. 18]. The ALJ found that the "A" requirements were satisfied because plaintiff had anhedonia, decreased energy, sleep disturbance, feelings of guilt or worthlessness, difficulty

7

concentrating and thinking, and thoughts of suicide; and he found the "B" requirements were satisfied because plaintiff experienced marked restrictions in activities of daily living, marked difficulties in social functioning, and marked difficulties with concentration, persistence, or pace. [Tr. 18-19]. The ALJ found that plaintiff met the requirements of Section 12.09 because he had "marked impairments while under the effects of substances." [Tr. 19].

The ALJ also concluded that plaintiff's drug and alcohol abuse was a factor material to the disability determination. [Tr. 21]. The ALJ found that if plaintiff stopped his substance abuse, his remaining limitations would not meet or medically equal Listings 12.04 or 12.09. [Tr. 22]. If plaintiff stopped his substance abuse, the ALJ concluded that the "B" requirements would not be met as plaintiff would have mild restrictions in activities of daily living, and moderate difficulties in social functioning and concentration, persistence, or pace. Id. The ALJ also considered whether the requirements of 12.04(C) were met, and determined that plaintiff did not meet the "C" requirements, as plaintiff was able to function independently and there was no medical evidence indicating that plaintiff had decompensated for an extended time due to the affective disorder or increased mental demands. Id.

8

The ALJ then determined that plaintiff's limitations result in a severe impairment or combination of impairments even if plaintiff stopped abusing substances. [Tr. 21]. As the ALJ did not conclude that plaintiff was per se disabled, absent substance abuse, at step three, he proceeded to determine plaintiff's RFC and whether plaintiff could perform his past relevant work if plaintiff stopped his substance abuse. [Tr. 23].

The ALJ determined that, if plaintiff stopped his substance abuse, he would have the RFC to perform a full range of work at all exertional levels with the non-exertional limitations of being confined to jobs involving simple, routine repetitive tasks with short, simple instructions and few workplace changes, occasional superficial interactions with coworkers and no interactions with the public. Id. The ALJ also described plaintiff as having the attention span to perform simple work tasks for two-hour intervals in the course of an eight-hour workday with no high paced production demands or requirement for strict adherence to timed production. Id. At step four, the ALJ concluded that the plaintiff is unable to perform any past relevant work. [Tr. 26]. After considering the plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded, based on the vocational expert's testimony, that plaintiff could perform the requirements of a dishwasher,

laundry laborer, or sanitation worker [Tr. 27]. Finally, the ALJ concluded that, because the substance use disorder is a contributing factor material to the determination of disability and plaintiff would be able to perform a job in the national economy if he stopped substance abuse, the plaintiff is not disabled within the meaning of the Social Security Act [Tr. 28].

## IV.  SUBSTANTIVE EVIDENCE

Plaintiff was born on August 26, 1960, was forty-nine years old on the date of alleged onset of his disability in March 2010, and was fifty-one years old at the time of the January 2012 ALJ decision [Tr. 28, 37, 39], which is the decision now under review.

### A.  **Hearing Testimony**

On December 13, 2011, a hearing was held where plaintiff Gregory Wehrhahn testified. [Tr. 36]. Plaintiff testified that, since August, he lives alone in a "HUD-VASH"[2] apartment. [Tr. 41]. Prior to August, he lived in two different places: in Veterans Administration ("VA") housing, as well as with a female friend. [Tr. 42].

Plaintiff did not finish high school, but obtained his GED

---

2 The HUD-VASH voucher program provides housing for homeless veterans who require case management services due to "serious mental illness, substance use disorder history, or physical disability," but who "must be able to complete activities of daily living and live independently in the community with case management and supportive services." U. S. Dep't of Veterans Affairs, "HUD-VASH Eligibility Criteria," available at: http://www.va.gov/homeless/hud-vash_eligibility.asp.

[Tr. 42]. At the time of the hearing, he worked at Independent Work Therapy ("IWT"), where he is paid $3.55 an hour, and had been assigned work for a combined total of approximately twenty-six weeks. [Tr. 42-43]. Plaintiff testified to generally enjoying his work, although he noted that he has had panic attacks on the job. [Tr. 43-44]. Plaintiff reported that his last full-time employment was at Gearing Metal, where he was responsible for all incoming and outgoing shipments and had "extensive telephone contact with the customers." [Tr. 44]. Prior to Gearing Metal, plaintiff worked at Telrepco where he was an assistant warehouse manager, performing duties similar to those at Gearing Metal, for a period of two years. [Tr. 45]. Plaintiff also worked at Etsuco Communications for six years where he drove a truck and performed inventory control, including documenting incoming and outgoing packages. Id.

Plaintiff noted that his absenteeism has "been an ongoing thing my whole life." [Tr. 46]. Plaintiff reported being hospitalized in March 2010, after having severe suicidal thoughts and bad insomnia and calling the suicide hotline three or four times that week. [Tr. 46-47]. After being hospitalized at Yale, plaintiff reported for a six-week program and underwent four hours of therapy a day, after which he began weekly visits with VA providers. [Tr. 47].

Plaintiff agreed that he gets nervous around people and

11

noted that he feels like he weighs 1,000 pounds in the morning
and that his "depression really gets the better of [him]" to the
point where it is difficult to take a shower some days. [Tr.
48]. He reported that he has panic attacks and bipolar disorder
and described having a few good days at a time where he can
leave the house and is "just thrilled," after which he will
crash for two or three weeks at a time. Id. Plaintiff reported
taking medication as prescribed. [Tr. 49].

Plaintiff reported going grocery shopping once or twice a
week; he described that he keeps his head down and runs out the
door when doing so because he is "petrified of crowds." [Tr.
49]. Plaintiff notes that he has difficulty sleeping, sometimes
staying up for fifty hours straight and then crashing for
twenty; he also reported using a CPAP machine for sleep apnea.
[Tr. 50].

Plaintiff reported taking a daily medicine to treat his
gout, a condition he has had for twenty years. [Tr. 51]. He also
has two bulging discs in his back and "leaky valves," which he
states do not bother him at present. Id. Plaintiff noted that he
is able to concentrate "fairly well" when someone is paying him
to perform a task. Id.

Plaintiff reported feeling much better in July after being
put on new medications and even noted, "I thought I was,
actually, cured." [Tr. 52]. At that point, he refused resources,

12

stating that he knew what he needed. Id. The ALJ asked him whether suicide was a crutch or, alternatively, a way of seeking attention, which plaintiff denied and stated that he had "to bring it to the attention to the fact that I'm having these thoughts" and that sometimes you have to kick and scream to get help. [Tr. 53-54]. The ALJ also inquired why plaintiff believes he cannot work, to which he responded,

> It's the whole fear of life thing. It's the whole depression, the bipolar, combination of everything, the agoraphobia . . . . All I know is right now, I just dread the thought of having to, you know, to meet new people, to get myself back in that environment to have to perform, and I know – I know I'm not gonna make it everyday, and I don't want to let myself down again. [Tr. 54].

Plaintiff acknowledged having a few "slips" into alcohol again and stated that he was no longer attending Alcoholics Anonymous ("AA") meetings. [Tr. 54-55].

**B.   Records of Andrew C. Wormser, M.D.**

Plaintiff was seen by Dr. Wormser two times, on August 7, 2007, and September 7, 2007. [Tr. 1159]. These visits and other interactions that plaintiff had with Dr. Wormser's office are memorialized on two pages of the record. See Tr. 1158-59. On August 7, 2007, Dr. Wormser noted that plaintiff was still drinking, depressed, not sleeping well and thinks about hanging himself, but that Betty, his girlfriend, does not believe him to be suicidal. [Tr. 1159]. On September 7, 2007, Dr. Wormser noted

that plaintiff was not doing well and that plaintiff reported sleeping twenty hours a day, but that he feels better. [Tr. 1159]. Dr. Wormser provided plaintiff with five refills of Indomethacin on October 11, 2007; January 18 and October 3, 2008; February 10 and April 7, 2009. [Tr. 1158-59].

**C.   Cornell Scott Hill Health Center**

On November 21, 2009, plaintiff was seen for an upper respiratory infection and to request Viagra. [Tr. 224]. Plaintiff returned on September 3, 2009, complaining of right foot pain. [Tr. 226].

**D.   APT Foundation**

Plaintiff attended outpatient group drug free therapy sessions at the APT Foundation on February 3, February 4, February 12, March 8, and March 12, 2010. [Tr. 268, 269, 271, 272, 273]. Plaintiff missed therapy at times due to relapses. [Tr. 272]. On March 18, 2010, plaintiff arrived on an unscheduled basis to discuss that he had continued to drink, but cut back significantly, and that he would return next week for group. [Tr. 274]. Plaintiff again arrived on an unscheduled basis on April 7, 2010, reporting that he had been released from the hospital yesterday after a ten-day hospitalization for suicidal ideation and agreeing to attend group once or twice per month. [Tr. 275]. Plaintiff reported drinking 1.5 pints of Jack Daniels daily when he has the money to do so. [Tr. 276].

14

Plaintiff also reported prior history of using crack cocaine, but no recent use. [Tr. 290]. Plaintiff reported being unemployed since 2007 and that he recently stopped receiving his unemployment benefits. [Tr. 292].

E.   **Yale New Haven Hospital**

Plaintiff presented at the Yale New Haven emergency room on March 29, 2010, stating that, "[i]t's time to end it," and was noted to be intoxicated. [Tr. 229]. Plaintiff had attempted to hang himself with a cord in the garage two years ago, according to his girlfriend of eight years. [Tr. 229, 232, 241]. Plaintiff was noted to be cooperative, with periods of irritability, paranoid, and having intermittent hallucinations. [Tr. 231]. Plaintiff was admitted to the hospital for this episode on March 29, and discharged on April 6, 2010, with a principal diagnosis of depression and other diagnoses of alcohol dependence and gout. [Tr. 233]. It was noted that plaintiff's "condition improved along the lines of an improvement in his symptoms of depression." [Tr. 234]. On March 30, 2010, plaintiff noted that he "was just drinking too much." [Tr. 236]. A note describes plaintiff to be nasty, belligerent, and resentful at times [Tr. 240].

After his hospital stay, plaintiff immediately entered an intensive outpatient program at Yale New Haven Hospital between April 7 and June 11, 2010. [Tr. 258]. He was screened for

inclusion in a more intensive program, Dialectical Behavior Therapy, but did not qualify [Tr. 259]. Instead, he joined the Dual Diagnosis Intensive Outpatient Program ("DDIOP"), for patients with "a wide range of psychiatric disorders compounded by substance abuse."[3] [Tr. 259]. His chart shows that he had been kicked out of the house by his girlfriend of eight years recently. [Tr. 258]. Plaintiff's attendance at the meetings was noted to be excellent and his participation was "overall positive and helpful." Id. Plaintiff did not take medications during this period because he could not afford them, but started to attend the VA during this time period in hopes of procuring medications there. Id. He was currently living in a friend's camper. Id. Plaintiff relapsed once during this program because he was "tired of feeling so irritable all the time." Id. On June 11, 2010, Dr. Ralph Hoffman noted that plaintiff had some "slip last week." [Tr. 320]. Plaintiff tested positive for benzodiazepines on April 9, April 14, April 21, and April 30. [Tr. 315-19].

### F.   Veterans Administration Medical Center

On May 5, 2010, plaintiff was added to the high-risk suicide list and it was noted that he should have been added as of March 29, 2010, due to his hospitalization at Yale-New Haven

---

3 See Yale Medical Group, "Dual Diagnosis Intensive Outpatient Program, available at: http://yalemedicalgroup.org/services/org.aspx?orgID=109786#page1.

Hospital for a suicide attempt. [Tr. 370].

On May 6, 2010, Bryan Shelby, M.D. noted that plaintiff had been discharged four weeks before from detoxification and mental health treatment at Yale-New Haven. [Tr. 366]. Plaintiff stated that he had been drinking two gallons a week for almost ten years prior to his admission and that he had never been sober for more than a thirty day period in the past twenty years. [Tr. 366-67]. Plaintiff presented with fluctuating mood, inconsistent sleep, and was distracted with poor concentration, but denied a desire to hurt himself. [Tr. 366]. Plaintiff attempted to hang himself approximately ten years prior with an extension cord; he attributes this attempt to a side effect of Wellbutrin. [Tr. 367]. The cord broke and he was released from the emergency room hours later, after being treated for his injuries. Id. He attended AA meetings for approximately six months but reported that such meetings made him want to drink more. [Tr. 367]. He reported being "skeptical" regarding his ability to remain sober. [Tr. 367]. Dr. Shelby concluded that plaintiff's symptoms fit within a "bipolar diathesis" and that plaintiff is a current low risk for suicide, but a high long-term risk if his substance dependence is not treated. [Tr. 368].

On May 7, 2010, plaintiff called to request medication for his gout attack [Tr. 362]. It was noted that plaintiff has not tried any suppressive medications for gout. [Tr. 361]. On May

17

26, 2010, plaintiff started Allopurinol. [Tr. 349].

On May 17, 2010, plaintiff reported that he attributes his positive thinking to sobriety and to his engagement with a therapy group at DDIOP. [Tr. 358]. Plaintiff reported mainly struggling with keeping sober and his depressed mood. Id. Dr. Mohini Ranganathan saw plaintiff and described him as "quite cheerful during the interview," yet noted that plaintiff stated that his apparent cheer should not fool her. [Tr. 359]. In early June, plaintiff left a voicemail that sounded "fairly sad," but when Dr. Ranganathan called him back he appeared cheerful and reported that he wanted to talk about his housing application. [Tr. 346]. On June 11, 2010, plaintiff reported drinking alcohol on Wednesday and Friday, but denied any problems from the same. [Tr. 344]. Plaintiff continued to report feelings of hopelessness and vague thoughts of "life not being worth it." [Tr. 344]. On June 22, 2010, plaintiff again reported symptoms of depression and frustration with his housing situation. [Tr. 343]. On June 25, 2010, it was noted that plaintiff was soon to be admitted to an inpatient alcohol detox program and that "depression with suicidal thoughts and occasional mood swings have been much more notable in the context of substance abuse, although more often he has felt depressed." [Tr. 335]. The intake screener noted that plaintiff appears to have "cluster B personality behaviors" and that plaintiff had no intention of

coming in for admission today because he had to meet his girlfriend. Id.

On July 1, 2010, plaintiff was admitted to the Psychosocial Residential Rehabilitation Treatment Program ("PRRTP"). [Tr. 451, 455]. His primary diagnoses were alcohol dependence, history of polysubstance abuse, mood disorder NOS (rule out substance-induced) and treatment compliance problem. [Tr. 451]. Plaintiff drew a train heading toward a wall and described himself as the train in his art therapy class, which he stated was "a waste of time." [Tr. 442]. Plaintiff acted "hostile about being in the program." [Tr. 441]. Plaintiff's subsequent art therapy classes were not marked by hostility, but "comments about his work are congruent with his generally sad affect" [Tr. 417]. Plaintiff's goals for the PRRT program included to find permanent housing of his own, to obtain welfare assistance, and to get his eyes and teeth checked. [Tr. 433]. Plaintiff was noted to be "accepting of treatment" and motivated on July 6, 2010. [Tr. 426]. On July 7, 2010, a social worker noted that plaintiff had a misunderstanding about the services offered at the VA and, in particular, whether they provided financial support; plaintiff stated that if he does not get his financial needs met that he'll "walk" and "leave the program because I need money." [Tr. 423]. On July 9, 2010, during a spirituality assessment, plaintiff noted that he "prayed for

death to come," although denied any intention to harm himself, and expressed hope that this program would be a "Hail Mary Pass" for him. [Tr. 412]. On July 9, 2010, plaintiff expressed displeasure with the housing options discussed with him, as they either required taking a bus to and from the VA or living with a lot of other people; it was also noted that "he is not sure if he is able to work at this time" and stated that it would "screw up" his disability claim if he were to do so. [Tr. 399]. Plaintiff reported initially taking psychotropic medication for depression in 2007. [Tr. 394]. Plaintiff was assessed as being a low-medium imminent risk of harm to himself on July 9, 2010 [Tr. 396].

On July 13, 2010, plaintiff reported that the program was not helping him, as it is difficult for him to be in crowds of people. [Tr. 386]. On July 14, 2010, plaintiff met with his provider for a discharge session because he felt the program was not helpful to him and that "someone else needs my bed more than I do"; plaintiff was administratively discharged on July 16, 2010, for violating the attendance policy. [Tr. 377, 375].

After returning to his friend's trailer in Hamden, plaintiff met with Dr. Ranganathan and reported that he had no worsening of his depressive symptoms, but that he has good and bad days. [Tr. 374]. During another follow-up outpatient appointment with Dr. Ranganathan on July 28, 2010, plaintiff

reported binge drinking at least once a week and that he has good and bad days with depressed mood significant at times. [Tr. 373].

On August 2, 2010, plaintiff presented to the VA emergency room complaining of hip and elbow pain, noted to be "possibly gout." [Tr. 629]. Plaintiff also presented with suicidal ideation, noting that he wanted to overdose on sleeping pills, climb a tree, put a noose around his neck, and fall. [Tr. 623]. He had drunk several fifths of vodka over the past couple days and used three bags of cocaine the Wednesday prior. Id. Plaintiff was admitted to the psych unit. [Tr. 619]. It was noted that they wanted to rule out bipolar disorder. [Tr. 618]. Plaintiff was noted to have suicidal ideation that is "likely fueled by intoxication / recent binge, but he appears to have an underlying mood disorder which he has apparently only allowed limited medication trials during the last few months since entering treatment at the VA MHC." [Tr. 611].

On the morning of August 3, 2010, it was noted that plaintiff was observed all night and was safely detoxing. [Tr. 592]. During the afternoon of August 3, 2010, plaintiff rested in bed, easily engaged with others and denied suicidal thoughts. [Tr. 572]. On August 4, 2010, plaintiff was described as "better overall" and comfortable "as he is removed from his financial/housing stressors." [Tr. 562]. It was noted that

plaintiff does not give classic bipolar symptomology, but that his "reactive mood and periods of irritability make his underlying psychiatric disorder suspicious for bip[o]lar spectrum disorder." [Tr. 561]. Plaintiff reported that his feelings of anxiety and depression have improved and that his anxiety is derived from "being around other people." [Tr. 560]. On August 5, 2010, plaintiff reported feeling less anxious and depressed and that he is "motivated to try to work things out." [Tr. 552].

On August 6, 2010, plaintiff was not interested in outpatient treatment programs or seriously considering treatment of his substance abuse on an inpatient basis. [Tr. 545]. It was also noted that he has "possible paranoid traits," but no evidence of hypomanic or manic state. Id. Plaintiff reported that he had a bad night and was agitated and that, if he had "a 3 day pass," he would drink for the first two days and show up the third day sober. [Tr. 543]. On August 7, 2010, plaintiff was cooperative with care and spent the day watching television and napping. [Tr. 535]. On August 8, 2010, plaintiff had kept to himself with a blunt affect, but remained cooperative. [Tr. 528]. On August 9, 2010, plaintiff was providing a history that was "very suspicious for panic disorder with agoraphobia," but he did not meet all criteria. [Tr. 523]. It was also observed that plaintiff "appears to view suicidal thoughts as a coping

22

strategy / control mechanism for dealing with great deals of distress." Id. Plaintiff reported having "panic attacks" and a "phobia" of public places. [Tr. 521]. He attended therapy on August 9, 2010, and expressed his intention to comply with treatment. [Tr. 517].

On August 10, 2010, plaintiff reported decreased sleep due to his roommate's snoring and that he was "very agitated" and "ready to explode." [Tr. 511]. On August 11, 2010, plaintiff was transitioned from Seroquel to Risperidone and his mood was stable. [Tr. 499, 489]. On August 12, 2010, plaintiff reported feeling alright, less anxious and irritable, and no suicidal ideation. [Tr. 482]. Plaintiff met with a social worker on August 12, 2010, to discuss maximizing benefits, income, and housing options. [Tr. 481]. The attending psychiatrist on August 12, 2010, described plaintiff's suicidal ideation as "an important clinical symptom," and his desire to create a discharge plan that addresses his social issues, including the loss of his long-term relationship, his lack of work/income, and his homelessness. [Tr. 515]. On August 13, 2010, plaintiff was spending more time outside of his room. [Tr. 465]. On August 14 and August 15, 2010, although plaintiff was noted to have blunt affect, he self-reported that he was okay. [Tr. 457, 787].

On August 16, 2010, Drs. Lewis and Glass noted that plaintiff's mood reactivity as still an issue, but that

plaintiff was less irritable and anxious appearing. [Tr. 784].
They also identified plaintiff's alcohol dependence as a major
issue that will likely continue after discharge, as plaintiff
has poor insight into his dependence and does not view it as a
major issue. [Tr. 785].

On August 17, 2010, plaintiff complained of pain in his
right elbow, which was regarded as a potential gout flare up.
[Tr. 774]. A social worker noted on the same date that plaintiff
"fluctuates between [being] totally reliant on help and wanting
to be completely independent." [Tr. 772]. Drs. Lewis and Glass,
on August 18, 2010, noted that plaintiff "is realizing that etoh
is [a] problem for him although he continues to deny that he is
'addicted'." [Tr. 762]. They also noted that plaintiff is no
longer writing "goodbye letters" and is not currently having
suicidal ideations. [Tr. 763]. On August 19, August 23, and
August 24, 2010, Drs. Glass and Lewis found plaintiff improving
in terms of gaining insight to his alcohol dependence and
chronic passive suicidality. [Tr. 752, 737, 729]. On August 19,
plaintiff reported that he was "ready to blow" due to his
increasing irritation with inconsiderate patients on the same
unit. [Tr. 751]. On August 23, plaintiff stated that he still
thinks about committing suicide, but it not sure if he will do
so in the future. [Tr. 736]. On August 25 and August 26, 2010,
Drs. Glass and Lewis noted that plaintiff is exhibiting mild

progress with regard to his chronic passive suicidality and has made good progress regarding his willingness to attend alcohol dependence programs, although plaintiff was noted to be making contradictory statements concerning his perception of his alcohol dependence to various clinicians on August 26, 2010. [Tr. 721, 710]. Drs. Glass and Lewis describe plaintiff as having a classic history of panic attacks and agoraphobia, as well as obsessive-type behaviors such as repetitive hand washing. [Tr. 710]. On August 27, 2010, plaintiff noted that he feels a lot better and is happier and lighter. [Tr. 701]. On August 30, 2010, it was noted that plaintiff left the facility over the weekend on a pass without incident. [Tr. 680].

On August 31, 2010, upon his discharge from inpatient care, plaintiff returned to the ER and was admitted to the "Next Steps" program in the PRRTP. [Tr. 670]. The Next Steps program is a "voluntary psychosocial residential rehabilitation treatment program" from which plaintiff can request discharge at any time. [Tr. 964]. He noted that he was homeless and "thought [he'd] just come back through the ER to get here since I don't really have any choice right now." [Tr. 670]. The clinician admitting him noted that his previous suicide attempt was more properly a suicidal gesture rather than a bona fide attempt and that plaintiff's "more than fleeting suicidal thoughts have been in the context of alcohol and/or drug use." [Tr. 670]. It was

noted that plaintiff previously refused to complete the
substance abuse program in July and refused various housing
options as well at that time, but that plaintiff is accepting of
such help now "because he has no other options at this time."
[Tr. 670-71].

On September 2, 2010, Howard Steinberg, Ph.D., in his
intake note, reiterated that plaintiff's suicide attempt was a
gesture, rather than a bona fide attempt and also commented that
he has only has suicidal thoughts in the context of substance
abuse. [Tr. 986]. Drs. Souza and Williams noted on September 10,
2010, that plaintiff "has a manipulative quality, but does seen
to wan[t] to establish housing and outpatient programs, while
gradually working towards employment." [Tr. 958]. Plaintiff did
not attend meetings on September 19, September 21, and September
26, 2010. [Tr. 924, 918, 904]. On September 25, 2010, plaintiff
was asleep during most of a group meeting. [Tr. 905].

On September 29, 2010, plaintiff met with a social worker
to discuss the responses to his weekly recovery plan; in
response to the question of what he would do if his plan for the
week is not working, he said that he would commit suicide in
November. [Tr. 895]. When plaintiff met with the social worker,
he stated that he felt frustrated with his housing options and
that "I keep asking but nobody has any answers for me." Id. On
September 30, 2010, plaintiff's discharge date, Dr. Williams

listed plaintiff's diagnoses as bipolar disorder, manic (atypical irritability), mood disorder, cluster B traits, and alcohol dependence; he noted that he ruled out personality disorder. [Tr. 876, 1152].

Plaintiff was scheduled to be admitted to the Recovery House on October 1, 2010; however, he delayed his admission, but agreed to present to the Recovery House on the following Monday. [Tr. 1154]. On October 3, 2010, plaintiff arrived at the VA, feeling "unsafe and suicidal," with a plan to overdose on whiskey and medications. [Tr. 1152]. He had relapsed on Friday and Saturday nights, drinking alcohol and sharing $60.00 worth of crack with two people. Id. A mental status exam was attempted at the VA, but it was "limited as he [was] uncooperative." [Tr. 1146]. It was noted that, "[a]lthough reporting SI's [suicidal ideations] he is also future oriented, seeking to stay in the hospital till Monday and then go to Recovery House". Id. When plaintiff was discharged the same day, it was noted that he did not appear to be a high risk for suicide, despite his chronic suicidal thoughts. [Tr. 1136].

On October 4, 2010, plaintiff met with a social worker who informed him that his relapse this past weekend would affect his admission into other housing programs, but not to the Recovery House, where plaintiff was set to stay beginning on Monday; plaintiff was upset to learn this information. [Tr. 1130]. After

spending one night at the Recovery House, plaintiff left as "it is not for [him]" and he felt unsafe. [Tr. 1130, 1128].

At this point, on October 5, 2010, plaintiff again presented to the emergency room, where he stated, upon admission, "I can't live out there anymore, I need supervision." [Tr. 1119]. Plaintiff, during his intake, additionally reported that he is a germaphobe and that he could not remain at the Recovery House because he is "not like those people." Id. In the same intake document, it was noted that, "Mr. Wehrhahn states he can[n]ot work but would not elaborate as to why." [Tr. 1120]. Plaintiff also stated that he will kill himself if discharged. [Tr. 1115]. On October 6, 2010, Ms. Giesman-Eichner, an advanced practice registered nurse, noted that plaintiff's history of traumatic brain injury "[w]arrants further investigation" and that plaintiff has "little insight into his psychosocial issues and would benefit from long-term therapy to give him coping skills and to manage his personality and character issues." [Tr. 1105]. The same note quoted plaintiff as stating,

> I deserve a nice place to stay, I'm not going to another place like Recovery House, I want a nice place with my own room, you might as well just send me to 8 (8W) because I have no other options but to kill myself.

Tr. 1104. It was also noted that he slept well and ate. [Tr. 1104].

On October 7, 2010, plaintiff was determined to require

28

transfer to inpatient-level care and was admitted to G8W, where he tested positive for cocaine. [Tr. 1077, 1070]. The attending psychiatrist, Dr. Lewis, described plaintiff as "not able to maintain himself outside of these supervised settings for any length of time without relapsing," referring to plaintiff's VA hospitalizations. [Tr. 1072]. Dr. Lewis also noted that plaintiff "regards himself as completely incompet[e]nt" and "complains bitterly if expected to act on his own behalf." Id. She notes that he does not "present as classically depressed," although he does "readily make paranoid interpretations of others actions." Id. Dr. Lewis characterized plaintiff as having no other medical issues other than, potentially, his cocaine and alcohol use from the prior weekend. Id. She described his presentation as appearing to be "characterologic in nature," although acknowledges that this is insufficient to explain his substance abuse or history. Id. She noted that he likely has an anxiety disorder, characterolgic maladaptive traits and rigidities, and substance dependence. Id.

While providers suspected plaintiff to be bipolar in a prior admission, Drs. Michaelsen and Lewis described plaintiff as irritable but not manifesting the hypomania or mania characteristic of bipolar disorder. [Tr. 1070]. Drs. Michaelsen and Lewis stated that plaintiff's irritability may be "a manifestation of his underlying anxiety disorders, especially in

the setting of significant stress regarding his living and financial situations. Id. Plaintiff has poor insight into his substance abuse; while he admits that alcohol played a role in him losing his job, he does not realize the full extent of alcohol's effect on his life and only demonstrates concerns that his "slips" will be reported to housing authorities. Id. It was noted that plaintiff's current suicide episode is in the "context of substance abuse (alcohol and cocaine)," distress over his homelessness, and anxiety over beginning at the Recovery House. [Tr. 1069]. It was also noted that "a couple years ago he began drinking more and he lost his job (r/t [related to] alcohol)." [Tr. 1066].

On October 8, 2010, a dietician attempted to modify plaintiff's diet to address his high cholesterol and improve his gout symptoms, but plaintiff was not interested in changing his diet; the dietician noted that plaintiff has previously denied her attempts, stating that he was going to eat what he wanted. [Tr. 1063].

On the same day, a social worker noted that plaintiff's "substance abuse issues appear to be a barrier for him reaching his goals," which she described to include finding employment and permanent housing. [Tr. 1057]. On October 12, 2010, plaintiff described his irritability toward others as "a matter of self-respect" that requires him to "giv[e] it back twice as

much" when he perceives someone to insult him. [Tr. 1025]. On October 13, 2010, plaintiff further expressed that he sees benefits to his overreactions in that they help "get [his] point across." [Tr. 1016]. On the same date, plaintiff "went crazy" because another patient moved his laundry. [Tr. 1014]. Plaintiff stated that he feels scared about having to visit Soldier On, a housing site, the following week, and is, in general, a pessimist and worried about how things can go wrong. [Tr. 1014]. On October 14, 2010, plaintiff was noted to be mean and intolerant with other patients. [Tr. 1004].

On October 18, 2010, plaintiff stated that he did not believe in hyperlipidemia and, as such, does not care what his cholesterol level is. [Tr. 1223]. On the same day, plaintiff was reported to be irritable and rude to the staff, and reported having diarrhea several times. [Tr. 1219]. Early the next day, around 2:30 a.m., on October 19, 2010, plaintiff requested Maalox and was refused it since he was set to provide a lipoprotein blood sample later that morning. [Tr. 1215]. When he was refused Maalox, he threw water. [Tr. 1215]. Approximately a half hour later, he returned to the staff desk and asked again for Maalox and was provided with it. [Tr. 1215].

On October 19, 2010, plaintiff decided that he wanted, after discharge on October 20, 2010, to live at the Homes for the Brave in Bridgeport and to enter the Substance Abuse Day

Program ("SADP") program. [Tr. 1207, 1195]. At the time of discharge, plaintiff was taking allopurinol, colchicine, diphenhydramine, divalproex, nicotine patch, and risperidone. [Tr. 1200-01]. It was noted on October 25, 2010, that plaintiff "has little insight to his illness and feels he should be in his own Apt. and not Recovery house or Home for the Brave where he is presently living." [Tr. 1175]. On October 28, 2010, it was noted that plaintiff "feels that SADP is for drugs and alcohol and geared for people who are below average intelligence"; plaintiff feels that Community Reintegration Program ("CRP") is more for psychological issues and considers himself to be more appropriately in CRP. [Tr. 1168-69].

On October 19, 2010, plaintiff was admitted to the CRP; plaintiff's goals for CRP were to stay sober and to reduce his anxiety. [Tr. 1539]. Plaintiff failed to attend CRP on December 1, 2010. [Tr. 1537].

On November 3, 2010, plaintiff met with a social worker who advised him that he was not on the Harkness House list. [Tr. 1573]. Surprised at his answer, plaintiff stated that he would "kill himself or to go 8 west if I have [to] drive from Bridgeport for CRP!" [Tr. 1573]. The social worker explained that Veterans do not typically transfer from one long-term housing program to another, but that plaintiff was encouraged to follow-up with his treating clinicians to determine what course

would be best for him. [Tr. 1573]. Plaintiff attended the SADP program on November 2, November 3, November 4, November 5, November 8, and was discharged on November 9, after completing the program. (1577, 1572, 1570, 1565, 1564, 1563].

On November 15, 2010, plaintiff participated in a compensated work therapy ("CWT") consult, where he stated that he didn't feel that he had any functional limitations for work "except in new situations." [Tr. 1447]. He described his vocational strengths as accuracy, close attention to detail, and the ability to complete a job quickly. [Tr. 1447]. The consultant was unable to help him, however, as the goal of the CWT program is to find the participant employment and plaintiff does not want community employment. [Tr. 1447]. Plaintiff expressed desire to participate in part-time employment, but said that he could not go over a specified income limit of $500 a month. [Tr. 1584-85]. On November 18, 2010, plaintiff complained of frustration with the system stemming from his recent rejection from the CWT program, and stated that he feels like he is gradually "going downhill." [Tr. 1553].

On December 2, 2010, plaintiff was noted to have made "a poor adjustment to the group shelter in Bridgeport" and is still requesting a move from Homes for the Braves to a housing program closer to New Haven. [Tr. 1536]. Specifically, he complained that he did not feel safe because Homes for the Brave is not an

exclusively VA population. [Tr. 1535]. Plaintiff relapsed on alcohol on December 10, 2010, and was put on probation; he was warned that a subsequent relapse would mean that he would be discharged from the program. [Tr. 1524]. On January 6, 2011, plaintiff requested a referral to Brownwell House. [Tr. 1621]. On February 3, 2011, plaintiff was discharged from CRP because he had been admitted to the IWT program and it was noted that he would follow-up with Dr. Williams on an outpatient basis. [Tr. 1610].

On February 10, February 17, February 24, and March 3, 2011, plaintiff was seen by Dr. Williams. [Tr. 1608, 1606, 1604, 1602]. On February 10, 2011, plaintiff reported that "[t]he job did not go well" and that he "couldn't deal with the stress of working and dealing with people." [Tr. 1608]. He was assigned to a job in the VA mailroom for four hours, five days a week. Id. On March 3, 2011, during a mental health visit, plaintiff reported that he started his new job at the VA and that, while he felt a great deal of anxiety prior to starting the job, he managed without difficulty once he arrived. [Tr. 1602]. On March 11, 2011, during a telephone encounter with his treating psychiatrist, he stated that he desired to change clinicians because, in part, Dr. Williams "didn't really think anything is wrong with [him]." [Tr. 1595]. Plaintiff continued to be seen on an outpatient basis for mental health treatment.

34

On April 7, 2011, plaintiff stated that the VA has "two months to save [his] life," as he is going to kill himself on Memorial Day. [Tr. 1700]. The advanced practice nurse practitioner ("APRN") noted that plaintiff's likely primary diagnosis is alcohol abuse and that she doubts that plaintiff has bipolar disorder; she stated that plaintiff's irritability may be substance-induced. [Tr. 1701]. On April 12, 2011, plaintiff complained of poor concentration and low energy and motivation. [Tr. 1699].

On April 13, 2011, plaintiff attended the weekly work group meeting for the Incentive Work Therapy program; he reported that, after weeks of delay due to anxiety and agoraphobia, he attended his first day of work that day. [Tr. 1698]. On April 19, 2011, plaintiff met with a social worker who described him as "not completely engaged in OP [outpatient] MH [mental health] treatment." [Tr. 1695]. On April 26, 2011, plaintiff, in his mental health visit, discussed visiting his family and friends and then "crashing." [Tr. 1692]. He noted being tired of his mood fluctuations. Id. On April 27, 2011, plaintiff's primary diagnoses were noted to be bipolar I and alcohol dependence. [Tr. 1690]. On May 3, 2011, plaintiff was noted to have reported that he has been unemployed since 2008 and "was fired twice because of [his] drinking." [Tr. 1687]. Plaintiff also reported that he wakes up every day and thinks "why don't I just kill

35

myself." Id. On May 3 and 10, 2011, it was noted that his concentration was improved, as evidenced by his reading. [Tr. 1687, 1681-82].

On May 17, 2011, plaintiff, currently residing at Homes for the Brave in Bridgeport, was reported to have stated that the "voices in his head were bothering him and that he wanted to go to the ER" and, then, drove himself to the VA ER, where he was admitted. [Tr. 1669, 1730, 1745]. He reported that he had been having increased suicidal ideation for four to five days, and does not want to live. [Tr. 1675]. On May 18, 2011, plaintiff was noted to be displeased with his housing at Homes for the Brave and that he was having great difficulty sleeping, getting only two to three hours each night. [Tr. 1728]. It was recorded that plaintiff "appears" to have been diagnosed with bipolar disorder. [Tr. 1728].

Dr. Phan, the attending psychiatrist, observed that plaintiff would likely be able to move from an inpatient to outpatient treatment if his housing issues could be satisfactorily addressed and if his benefits issues were "looked into." [Tr. 1729]. Psychiatry resident Muhle classified plaintiff as having severe and persistent mental illness and severe functional impairment, meaning that plaintiff is not currently capable of successful and stable self-maintenance and is unable to participate in necessary treatments without

36

intensive support. [Tr. 1737]. On May 19, 2011, during his psychiatry assessment, plaintiff was asked whether he could see a way out of his situation that did not involve disability payments or HUD help, and he replied that if he could find "some kind of magic combination of pills," that he might be able to address his depression. [Tr. 1718].

On May 20, 2011, plaintiff reported that his plan to kill himself on Memorial Day seems "too soon." [Tr. 1709]. It was noted that plaintiff was to be kept as an inpatient until after his chosen suicide date. [Tr. 1712]. Plaintiff was prescribed lithium and remained on propranolol, trazodone, and simvastatin. [Tr. 1711-12]. Plaintiff had diagnoses of bipolar disorder, anxiety, insomnia, substance dependence, and gout. [Tr. 1712-12].

On May 24, 2011, plaintiff stated that he attempted to work several times after his last job ended but that he "drank [him]self out of it." [Tr. 1875]. He recounted that he worked as a receiving inspector, but had called out sick so often due to being hungover that they fired him. [Tr. 1875]. Plaintiff was recorded as having several elevated blood pressure readings, but that plaintiff was not amenable to starting anti-hypertension medication. [Tr. 1879].

On May 25, 2011, plaintiff accepted an offer to enter the Critical Time Intervention ("CTI") program, which provides

intensive clinical case management services by a VA psychiatrist
for at least one year; he will continue working with his current
inpatient team until "an appropriate disposition plan can be put
into place." [Tr. 1821]. On May 27, 2011, plaintiff requested a
weekend pass; after the pass was denied, plaintiff requested to
be released against medical advice and was informed that he
could not, as his team was filing for involuntary commitment on
May 31, 2011, the next business day.[4] [Tr. 1800, 1781].

Plaintiff was then assigned 1:1 status, which seems to
require the presence of a clinician with plaintiff at all times;
plaintiff was placed on suicide watch after he made threats to
harm himself and "get even." [Tr. 1802, 1811]. On May 27, 2011,
plaintiff also was prescribed cochicine for a gout flare-up.
[Tr. 1806]. On May 29, 2011, plaintiff expressed that he wanted
to come off "1:1." [Tr. 1776]. On May 30, 2011, Dr. Balf noted
that plaintiff's status should continue to be with a 1:1
monitor. [Tr. 1767]. On May 31, 2011, plaintiff agreed to have
extra psychotherapy sessions to address his psychodynamic and
insight-oriented issues and his status was changed from 1:1 to
ward restricted with fifteen-minute checks. [Tr. 1847, 1854].

On June 1, 2011, plaintiff was described as being in good
emotional and behavioral control and was being "weaned off of

---

4 The Court does not find any evidence that involuntary commitment
papers were filed.

more restrictive status" and "working toward discharge." [Tr. 1834]. His previous traumatic brain injury, which occurred in 1982, was found to not have been associated with definitive changes in behaviors or cognitive functions. [Tr. 1853]. On June 2, 2011, plaintiff reported his mood as improved and less labile. [Tr. 1661]. Plaintiff learned that he would resume the IWT program and was pleased with this. [Tr. 1831]. On June 3, 2011, plaintiff was discharged from 8W and had plans to start IWT after spending a few days with family and friends. [Tr. 1645]. His admission and discharge diagnoses were bipolar disorder. [Tr. 1649]. Upon discharge, he was taking acetaminophen, allopurinol, aripirazole, bacitracin, citalopram, colchicine, cyclobenzaprike, indomethacin, lithium carbonate, nicotine, propranolol, simvastatin, trazodone, and mirtazapine. [Tr. 1646-47].

On June 7, 2011, during a mental health visit performed prior to plaintiff's transfer, plaintiff stated that he thought the lithium and Abilify were working well, that his mood was calmer, and that he was less reactive. [Tr. 1985]. The plan for plaintiff was to spend a few days with a friend prior to entering the CTI program on 7E for a year, where he will complete IWT. [Tr. 1988]. On June 9, 2011, Dr. Reddy performed an initial CTI evaluation on plaintiff, noting that plaintiff stated, with an inappropriate affect, that he will commit

suicide in October 2011. [Tr. 1974]. Dr. Reddy listed plaintiff's current psychiatric medications as citalopram, mirtazapine, trazodone, aripiprazole, and lithium. Id.

Plaintiff entered the Psychosocial Residential Rehabilitation Treatment Program ("PRRTP"), outpatient program on 7E, on June 10, 2011. [Tr. 1965, 1971]. This was plaintiff's third PRRTP admission in the past eleven months. [Tr. 1971]. Plaintiff's care plan included working in the IWT program, attending PRRTP groups seven times a week, meeting with PRRTP clinicians at least once per week, and providing breathalyzer and urine toxicology samples. [Tr. 1983].

On June 9, 2011, Dr. Yaggi summarized plaintiff's sleep study as showing "severe obstructive sleep apnea with improvement on CPAP"; plaintiff was referred to the sleep clinic so that a CPAP device could be ordered for him. [Tr. 1979]. Plaintiff met with social workers on June 8, 10, 16, 21, 23, 30, and July 1, 5, 7, and 11, to assist with medication supervision and supportive counseling. [Tr. 1937, 1970, 1932, 1927, 1926, 1913, 1911, 1910]. Plaintiff also attended PRRTP group regularly, see, e.g., 1958, and met with other clinicians, including physicians, several times. On June 13, 2011, Dr. Lincoln noted that plaintiff gained significant weight due to his psychiatric medications, and the clinicians suspected that plaintiff was developing metabolic syndrome. [Tr. 1956]. On June

15, 2011, plaintiff submitted a timesheet noting that he worked sixteen and a half hours the past week. [Tr. 1949]. On July 12, 2011, plaintiff met with a vocational specialist, who noted that plaintiff had recently moved to the Harkness House. [Tr. 1909]. On July 14, 2011, plaintiff was noted to have recently received a housing voucher and to be actively looking for an apartment to rent in West Haven. [Tr. 1904]. On July 20, 2011, plaintiff was noted to have expressed pride in having worked twenty hours during the past week in the IWT program for the first time. [Tr. 1901].

After plaintiff was notified that he was accepted into Harkness House beginning on July 1, 2011, he self-discharged from 7E on June 28, 2011. [Tr. 1919]. At the time of his discharge, plaintiff was taking simvastatin, colchicine, lithium carbonate, mirtazapine, vardenafil, fenofibrate, omeprazole, cyclobenzaprine, aripiprazole, propranolol, trazodone, acetaminophen, nicotine, and indomethacin. [Tr. 1921].

On August 3, 2011, a CT scan was performed on plaintiff's neck and a soft tissue density lesion was noted; it was written that malignancy was a possibility. [Tr. 1994-95]. On the same date, plaintiff also presented with low back pain, which gradually onset six months ago. [Tr. 2035]. Plaintiff reports that chiropractic care had benefit. [Tr. 2035]. On August 24, 2011, plaintiff was taken off the high-risk list for suicide.

[Tr. 2014].

Plaintiff was assisted by social workers with various activities, including driving to obtain food stamps and lab work, and filling his medication box on August 4, 10, 18, 23; September 1, 8, 9, 12, 15, 22, 23, 29; and October 5 and 6. [Tr. 2034, 2025, 2021, 2016, 2012-13, 2008, 2006, 2005, 2001].

On September 14, 2011, plaintiff reported working thirteen hours at his IWT job during the week prior. [Tr. 2007]. On September 23, 2011, plaintiff met with Dr. Gunduz-Bruce to address his reports of decreased motivation, anhedonia, and lack of energy after a reduction in his lithium dose; Dr. Gunduz-Bruce increased plaintiff's lithium dose. [Tr. 2003-2004]. On September 28, 2011, it was noted that plaintiff completed thirteen weeks of the IWT program and was granted an extension to perform another thirteen weeks. [Tr. 2002]. Plaintiff worked no hours the week prior to September 28, 2011, as he found it difficult to get out of bed, despite finding the work interesting. [Tr. 2002-2003].

On July 14, 2011, Dr. Reddy noted that plaintiff refused group options, rejected any help, and stated "I know what I need." [Tr. 2053]. Dr. Reddy suggested hospitalization, but plaintiff refused and Dr. Reddy noted that plaintiff does not fit the criteria for involuntary hospitalization. Id. On October 20, 2011, Dr. Reddy noted that plaintiff would benefit from AA

meetings, but is refusing them and also observed that plaintiff presented with daytime fatigue and increased sleep, possibly secondary to current meds. [Tr. 2052]. On December 1, 2011, Dr. Reddy observed plaintiff to be presenting with "mild depressive complaints related as per pt [patient] to psychosocial stressors." [Tr. 2050]. On January 5, 2012, plaintiff reported to Dr. Redy that he is sleeping four to six hours a night, but that he is "okay with that sleep." [Tr. 2046]. Dr. Reddy noted that plaintiff has traits of borderline personality disorder that would require ongoing assessment. [Tr. 2048]. Abilify was discontinued due to plaintiff's complaints of fatigue. [Tr. 2046-47]. On February 14, 2012, Dr. Trevisan met with plaintiff and discussed plaintiff's insomnia; Dr. Trevisan referred plaintiff to his regular treating psychiatrist, Dr. Reddy. [Tr. 2044-45]. On March 19, 2012, plaintiff met with Dr. Reddy, who noted that plaintiff has no current substance abuse or dependence, that he is not suicidal, and that he is seeking and future-oriented. [Tr. 2041]. Plaintiff's trazodone was increased to address ongoing anxiety. [Tr. 2042-43].

G.   **Medical Opinions**

1.   Psychiatric Opinion dated April 26, 2010, Michele Nyman Harris and Christine Desmond, M.D.

Counselor Harris and Dr. Desmond saw plaintiff between April 7 and April 26, 2010 four times weekly [Tr. 308, 311].

They found that plaintiff's condition slightly improved with treatment and that, with abstinence from alcohol, he can maintain employment, social relationships, and the ability to function effectively on a daily basis [Tr. 308]. Plaintiff had fleeting, yet frequent, suicidal thoughts; hopelessness, anxiety, and difficulty concentrating. [Tr. 308]. They rated plaintiff's abilities to handle frustration appropriately and to perform work on a sustained basis as very serious problems [Tr. 309-310]. They rated his abilities to use coping skills to meet ordinary work demands, to carry out multi-step instructions, to focus long enough to finish assigned tasks, and to respect and respond appropriately to those in authority positions to be serious problems [Tr. 309-10].

> 2.   Medical Opinion dated August 25, 2010, Susan V.
> Lewis, M.D.

Dr. Lewis reported treating the plaintiff between August 2 and August 25, 2010 [Tr. 637]. She diagnosed plaintiff with anxiety disorder, depression, and alcohol dependence, as well as ruling out bipolar depression. Id. She described plaintiff's substance abuse as in partial remission and noted that his mood stability is "likely worse w[ith] alcohol, but since he has had longer sober period[s] [he] has been assessed as depressed." [Tr. 637]. She noted that his concentration is impaired, albeit improving, and that his depression has also improved, although

it still persists when he is sober. [Tr. 637-38]. She rated his
ability to use appropriate coping skills to meet the ordinary
demands of a work environment to be a very serious problem; the
only other functional ability rated by Dr. Lewis as a serious
problem was plaintiff's ability to work on a sustained basis.
[Tr. 638-39]. Dr. Lewis found that plaintiff was "unable to work
at this time" and required ongoing outpatient intensive
treatment for depression, anxiety, and alcohol dependence.

> 3.   Disability Determination Explanation, initial
> level, dated September 9, 2010, Robert Decarli, Psy.D.

Carol Graczyk spoke with plaintiff concerning his gout on
September 7, 2010. [Tr. 65]. Plaintiff reported to Ms. Graczyk
that his gout "does not bother him now" and that he "does not
feel that his physical condition causes any work or daily
activity limitations at present." Id.

Dr. Decarli concluded that plaintiff had unsuccessful work
attempts because he was out of work for at least thirty
consecutive days and he was reduced to work levels less than
substantial gainful activity within three months of returning to
work. [Tr. 63].

Dr. Decarli reviewed records from the Connecticut VA
received on September 8, 2010; from Yale Psychiatric Hospital
received May 10 and August 28, 2010; from Cornell Scott Hill
Health Center received May 3, 2010; from Dr. Wormser received

April 20, 2010; as well as a VA opinion, dated August 25, 2010, as well as ADL reports from plaintiff. [Tr. 63-65]. Dr. Decarli concluded that plaintiff has affective disorders and an alcohol addiction disorder. [Tr. 66]. Dr. Decarli noted that plaintiff had sustained concentration and persistence limitations, and was moderately limited in his abilities to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a workday and workweek without interruptions from psychologically-based symptoms. [Tr. 69]. Dr. Decarli classified plaintiff as able to perform "simple work for 2hr periods in an 8hr day with adequate attention, concentration and pace." [Tr. 69]. Dr. Decarli also noted that plaintiff could have occasional problems, less than 1/3 of the time, with prolonged concentration and sustained pace due to periodic lowered mood. [Tr. 69]. Dr. Decarli concluded that plaintiff could "engage in typical interactions with coworkers and supervisors," but "would do best in a job away from the public." [Tr. 70].

Overall, Dr. Decarli concluded that plaintiff could perform his past relevant work and that plaintiff is not disabled. [Tr. 71-72].

> 4.   Disability Determination Explanation, reconsideration level, dated October 20, 2010, Christopher Leveille, Psy.D.

Dr. Leveille noted that plaintiff reported that his

depressive situation grew worse after July 1, 2010. [Tr. 89].
Kara Pelczarski noted that plaintiff's initial disability
application had been denied because, despite the fact that he
met Listing 12.04AB, he cannot be considered disabled because
substance abuse was a contributing factor material to his
disability. [Tr. 91-92]. It was concluded that if plaintiff
abstained from abusing substances, he would be able to perform
substantial gainful activity. [Tr. 92].

Dr. Leveille noted that plaintiff's primary impairment was
a substance addiction disorder, with secondary impairments of
affective disorders. [Tr. 93]. Dr. Leveille noted that plaintiff
has depressive syndrome as a result of the regular use of
addictive substances. [Tr. 93-94]. Dr. Leveille characterized
plaintiff as having marked restriction in his activities of
daily living, social functioning, and ability to maintain
concentration, persistence, or pace. [Tr. 94]. Dr. Leveille
agreed with Dr. Decarli as to plaintiff's ability to work two
hour periods in an eight-hour day and plaintiff's ability to
perform his past relevant work. [Tr. 96-98].

### V.   DISCUSSION

On appeal, plaintiff asserts the following arguments for
reversal or remand:

1. Whether the ALJ Based Various Assertions on
   Substantial Evidence;

2. Whether the ALJ Properly Followed the Treating

47

Physician Rule;

3. Whether the ALJ Based His Findings Regarding Which of Plaintiff's Impairments were Severe on Substantial Evidence and Properly Performed the Combination of Impairments Analysis;

4. Whether the ALJ Based His Conclusion That Plaintiff Would Not Meet a Listing If Plaintiff Was Sober on Substantial Evidence;

5. Whether the ALJ Properly Determined Plaintiff's Credibility; and

6. Whether the ALJ Based Plaintiff's Residual Functional Capacity on Substantial Evidence and Properly Assessed the Vocational Expert's Testimony

**A.    The ALJ Based His Assertions on Substantial Evidence**

Plaintiff argues that the ALJ made several factual errors and misstatements that were prejudicial to plaintiff's disability claim. [Doc. #21-1 at 9-14]. When the potential harm to a plaintiff from an error is "so apparent to a reviewing court that 'nothing further need be said,'" then the plaintiff's work is done. Koutrakos v. Astrue, 906 F. Supp. 2d 30, 41 (D. Conn. 2012); see also Shinseki v. Sanders, 556 U.S. 396, 410 (2009). However, if the potential harm is not apparent, plaintiff must demonstrate how the error was prejudicial. Shinseki, 556 U.S. at 410.

**i.  *Plaintiff's Mental Health Symptoms***

Plaintiff first argues that the ALJ improperly found that plaintiff's "mental health symptoms resolved" shortly after he

became sober around February 2011.[5] [Doc. #21-1 at 11-12].
Plaintiff also argues that the ALJ's characterization of
plaintiff's mental status and cognition as normal when plaintiff
is not abusing drugs or alcohol is not based on substantial
evidence. [Doc. #21-1 at 12].

As an initial matter, the ALJ did not state that
plaintiff's "mental health symptoms resolved" in his opinion;
rather, the ALJ stated that "the claimant has a greater level of
functioning in the absence of substance abuse" and that
plaintiff's "mental status and cognition are normal" when sober.
[Tr. 24, 25].

"The critical question is 'whether [the SSA] would still
find [the claimant] disabled if [he] stopped using drugs or
alcohol.'" Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 123 (2d
Cir. 2012) (citing 20 C.F.R. § 416.935(b)(1)); see also 20
C.F.R. § 416.935(b)(2)(i)("If [the Commissioner] determine[s]
that [the claimant's] remaining limitations would not be
disabling, [he] will find that [the] drug addiction or
alcoholism is a contributing factor material to the
determination of disability."). Here, the ALJ did not, nor did

---

5 Plaintiff seems to argue that mid-December 2011 is a more accurate
start date for plaintiff's sobriety than February 2011, the date the ALJ
used. [Doc. #21-1 at 11]. However, the ALJ did not pin plaintiff's sobriety
*alone* to February 2011 but, rather, noted that plaintiff "remained sober,
moved into his own apartment after securing it himself, applied for jobs in
the community, and has continued to work in his IWT position" after February
2011. [Tr. 25-26].

he need to, conclude that plaintiff has no mental health symptoms but, rather, that the limitations arising out of his substance abuse move plaintiff from a category of not disabled to disabled.

Plaintiff specifically points to a March 10, 2011, telephone call between Dr. Wendol Williams and plaintiff wherein plaintiff's description of being mugged earlier in the week, provided evidence that plaintiff has experienced "debilitating mental health symptoms" after his substance abuse remission. Id.; see also Tr. 1595. Plaintiff had missed his appointment with Dr. Williams the day prior and Dr. Williams noted that, if plaintiff did not want be seen by him, "he should be seen in the Psychiatry Emergency Room because he appeared to be in crisis." [Tr. 1595]. This advice was given in the context of an event nearly every person would find stressful: being mugged.

Plaintiff also supports his argument that plaintiff continued to experience debilitating mental health symptoms after becoming sober with the claim that plaintiff's treating providers noted him to be "still anxious and depressed even with his psychotropic medications." [Doc. #21-1 at 12]. This note, however, was plaintiff's subjective report, not his providers' objective analysis, and occurred on December 30, 2010, mere days into what plaintiff estimates to be his remission. [Tr. 1628, 1585]. During the same visit, plaintiff's providers noted that

50

they were "[c]urrently titrating lithium and citalopram to therapeutic dosing," presumably adjusting plaintiff's dosage in order to address his complaint. See Tr. 1628-29.

While plaintiff correctly argues that he was described as having sleep issues, daytime fatigue, and decreased motivation on March 19, 2012, he was also, in that same note, described as having no manic symptoms, no psychosis, no suicidal ideations, "fair grooming and hygiene," to not be anxious, to be goal directed, and to have a bright and appropriate affect. [Tr. 2041-42]. Further, plaintiff was noted to be "considering restarting employment." [Tr. 2042].

Plaintiff also cites a note dated February 14, 2012, where plaintiff was described as having sleep disturbance; however, it was also noted that his sleep disturbance may or may not be part of his affective disorder and that he is "actually sleeping but not at the right time for him to get ou[t] of the house for IWT." [Tr. 2044]. Additionally, plaintiff points to a December 1, 2011, note where plaintiff was described to have decreases in mood and motivation; here, plaintiff attributed his worsening mood symptoms to "recent financial worries and upcoming social security hearing." [Tr. 2049].

In contrast to the above, the ALJ provided over two pages of citations to the record demonstrating plaintiff's improved mental health functioning after his remission. On February 17,

2011, plaintiff reported that he had visited friends and spoken with his mother. [Tr. 1606]. The ALJ also referenced plaintiff's July 2011 community housing search, his assisting his girlfriend with chores, his work at the IWT job, and his taking road trips as evidence of his improved functioning while sober. [Tr. 25]. The ALJ also noted that plaintiff was taken off of the high risk suicide watch on August 24, 2011. Id. Additionally, the ALJ notes that, on June 28, 2011, plaintiff himself attributed his mood, being anxious and depressed, and his suicidal thoughts to substance abuse. [Tr. 1916]. Lastly, the ALJ cited portions of the record, which noted plaintiff's mental status to be normal or stable. See Tr. 21, 24, 25.

Another factor supporting the ALJ's conclusion that plaintiff had a higher level of functioning when not on drugs or alcohol is that plaintiff's inpatient mental health treatment was frequently expressly linked to his substance abuse. In February and March 2010, plaintiff attended outpatient drug-free therapy at the APT Foundation. See Tr. 268-273. Dr. Bryan Shelby characterized plaintiff's March 2010 inpatient stay at New Haven Hospital as a detoxification and mental health admission. [Tr. 366]. At the VA, between April and June 2010, plaintiff participated in the dual diagnosis intensive outpatient program ("DDIOP"), for veterans with psychiatric disorders that are made worse or complicated by substance abuse. See Tr. 258. He joined

DDIOP after not qualifying for more intensive programs. [Tr. 259]. Plaintiff's July 2010 admission to the psychosocial residential rehabilitation treatment program ("PRRTP") is characterized as an inpatient alcohol detoxification program [Tr. 335], and his diagnoses were alcohol dependence, polysubstance abuse, mood disorder, and treatment compliance problem. [Tr. 451]. His August 2010 hospitalization occurred after an increase in alcohol use; he drank several fifths of vodka and used three bags of cocaine in the days prior to his admission. [Tr. 567, 623]. While plaintiff was described as having an underlying mood disorder, it was also noted that his August 2010 bout of suicidal ideation was "likely fueled by intoxication / recent binge." [Tr. 611]. Plaintiff was safely detoxing on August 3, 2010, while an inpatient. [Tr. 592]. When plaintiff was admitted to the Next Steps program at the end of August, the clinician admitting him, as well as Dr. Howard Steinberg, characterized him as having suicidal thoughts "in the context of alcohol and/or drug use." [Tr. 670, 986]. Just prior to his admission to the VA in October 2010, he had slipped, drinking alcohol and using crack. [Tr. 1152, 1119, 1070, 1077]. That admission was described as being in the context of substance abuse. [Tr. 1069]. Plaintiff attended a substance abuse day program in November 2010. [Tr. 1563-77].

After plaintiff became sober, an advanced practice

registered nurse in April 2011 believed plaintiff's primary diagnosis to be alcohol abuse. [Tr. 1701]. While plaintiff was admitted as an inpatient to the VA in May 2011, after becoming sober, the attending physician noted that plaintiff could likely move to an outpatient treating modality if his housing and benefits could be addressed. [Tr. 1729]. In June 2011, plaintiff again entered the PRRT program, where he was required to provide breathalyzer and urine samples. [Tr. 1983].

Further, plaintiff at various times has attributed his depression, as well as his ability to retain employment, to his drinking. During his admission to Yale New Haven Hospital for detoxification and mental health treatment in March 2010, he characterized his situation as born out of "just drinking too much." [Tr. 236, 366]. In May 2010, plaintiff reported that he attributed positive thinking, in part, to being sober and noted that he is struggling to remain sober. [Tr. 358]. In late July 2010, plaintiff described that he was binge drinking at least once a week and that he has good and bad days; while he does not expressly associate the two ideas here, he discusses them in the same visit. [Tr. 373]. In August 2010, plaintiff identified alcohol as a problem, but stopped short of describing himself as addicted. [Tr. 762]. Plaintiff acknowledged that alcohol has been a factor in job loss. [Tr. 1070]. In April 2011, plaintiff attributed two firings to his drinking. [Tr. 1687]. In May 2011,

54

plaintiff stated that he lost a job because he called out too many times while experiencing hangovers. [Tr. 1875]. In October 2011, Dr. Reddy stated that plaintiff would benefit from AA meetings, which plaintiff was refusing to attend. [Tr. 2052].

Overall, there is substantial evidence for the ALJ's conclusion that plaintiff's mental health functioning was improved after plaintiff ceased drinking.

### ii. *Period of Relief*

Plaintiff further argues that such short periods of relief from his mental health impairments should not be considered significant. [Doc. #21-1 at 11-12]. However, when periods of symptom relief coincide with the plaintiff becoming sober, the analysis as performed by the ALJ was proper under 20 C.F.R. §§ 404.1535, 416.935, as the ALJ must "evaluate which of [plaintiff's] current physical and mental limitations, upon which [he] based [his] current disability determination, would remain if [plaintiff] stopped using drugs or alcohol."

### iii. *Ability to Work*

Plaintiff next argues that the ALJ's characterization that plaintiff "applied for jobs in the community, and has continued to work in his IWT position" is inaccurate for a variety of reasons. [Doc. #21-1 at 13]. First, plaintiff states that "he requires advocacy with employers," [Doc. #21-1 at 13], but the November 18, 2010, note he cites only states that plaintiff

would benefit from advocacy with employers, not that he requires it. [Tr. 1584]. Second, plaintiff states that he was unable to perform his IWT job unless his supervisor was there, but the cite provided seems to indicate that plaintiff was waiting for his supervisor to assign him responsibilities, not to intensely supervise plaintiff; indeed, on September 9, 2011, a month later, plaintiff was encouraged to have "back up tasks available if his supervisor is not available for new assignments so that he does not have idle time." [Tr. 2009]. Plaintiff also argues that he frequently fails to show up for work and does not have the energy to go out to work. [Doc. #21-1 at 13]. However, on June 30, 2011, plaintiff admitted that he missed work due to "being lazy." [Tr. 1914]. Further, on July 20, 2011, plaintiff expressed enjoyment when working out a challenging problem with his supervisor and that he found the work interesting. [Tr. 1901, 2002-03]. In short, the ALJ's characterization of plaintiff's work status was fair and based on substantial evidence.

### iv. *Suicidal Ideation as a Threat*

Plaintiff also takes issue with the ALJ's description that plaintiff "continued to use suicidal ideation as a threat, but when faced with hospitalization, he retracted his statement." [Tr. 25]. However, this was how Dr. Navin Reddy described plaintiff's suicidal ideation on July 14, 2010, [Tr. 1905], and

given that, the ALJ based this assertion on substantial evidence as well.

Overall, the ALJ based all of the above assertions on substantial evidence.

**B.**   **The ALJ Properly Applied the Treating Physician Rule**

Plaintiff next argues that the ALJ erred when assigning no significant weight to Dr. Susan Lewis's August 25, 2010, mental health assessment. [Tr. 633]. The ALJ found that:

> [w]hile [Dr. Lewis's] opinions may have been somewhat appropriate for that period, the records clearly show that when the claimant is abstinent from drugs and alcohol, his mood improves. His cognition and mental status have remained intact. His hospitalizations occurred because of substance abuse, not mental decompensation. Furthermore, his suicidal statements were made when he was trying to manipulate the clinicians or when under the influence of drugs and/or alcohol. Additionally, other VA staff members noted he was capable of gainful employment. [Tr. 26].

Pursuant to 20 C.F.R. § 404.1527(c)(2), a treating source's opinion will usually be given more weight than a non-treating source. If it is determined that a treating source's opinion on the nature and severity of a plaintiff's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record," the opinion is given controlling weight. 20 C.F.R. § 404.1527(c)(2). If the opinion, however, is not "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques, then the opinion

cannot be entitled to controlling weight. S.S.R. 96-2P, 1996 WL 374188, at *2 (S.S.A. Jul. 2, 1996). "Medically acceptable" means that the "clinical and laboratory diagnostic techniques that the medical source uses are in accordance with the medical standards that are generally accepted within the medical community as the appropriate techniques to establish the existence and severity of an impairment." S.S.R. 96-2P, 1996 WL 374188, at *3 (S.S.A. Jul. 2, 1996).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). Specifically, the ALJ should consider: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." Selian v. Astrue, 708 F.3d at 418 (citations omitted). The regulations require that the ALJ "will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion." Halloran, 362 F.3d at 32. Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." Sanders v. Comm'r of Soc. Sec., 506 F. Appx. 74, 77 (2d

Cir. 2012) (summary order); see also Halloran, 362 F.3d at 32–33.

While plaintiff argues that Dr. Lewis had been plaintiff's treating physician "since at least August 2010," [Doc. #21-1 at 18], at the time Dr. Lewis penned her opinion, in August 2010, she was in her first month of treating plaintiff. [Tr. 633-40]. The ALJ noted that Dr. Lewis's opinion "may have been somewhat appropriate for that period;" plaintiff was hospitalized when Dr. Lewis wrote her opinion in August 2010, and had not yet achieved remission, which plaintiff argues occurred in December 2010. See Tr. 619, 670; [Doc. #21-1 at 11-12].

Plaintiff also argues that Dr. Lewis noted that plaintiff was depressed even when sober and that there is no indication that Dr. Lewis "did not take [plaintiff's] sobriety into account" when writing her medical opinion. [Doc. #21-1 at 18-19]. While Dr. Lewis stated that plaintiff was in "partial remission," and specifically commented that plaintiff's mental health is "likely worse w/ alcohol" and that his "depression persists even when sober," [Tr. 633-34], there are no indications that Dr. Lewis performed the counterfactual analysis required to determine whether substance abuse was a contributing factor material to her assessment of plaintiff's functional limitations. While the opinion did ask how plaintiff's functioning is affected during significant periods of remission,

Dr. Lewis wrote a non-responsive answer, "while in hospital and outpt programs. More abstinent these past 6 months than ever before." [Tr. 637]. Dr. Lewis seems to be answering _when_ plaintiff achieves abstinence, not _how_ abstinence affects his functioning.

Importantly, it is claimant's burden to prove the immateriality of drug and alcohol abuse. See Cage v. Comm'r of Soc. Sec., 692 F. 3d 118, 123-24 (2d Cir. 2012). Since the ALJ rejected Dr. Lewis's opinion because it did not adequately account for plaintiff's limitations when not under the influence of drugs and alcohol, and it is plaintiff's burden to provide evidence to prove the immateriality of drug and alcohol addiction, the ALJ did not commit error when rejecting Dr. Lewis's opinion.

While plaintiff has not argued that the ALJ failed to develop the record in not requesting an updated medical opinion from Dr. Lewis, the Court notes that it is not necessary that the ALJ obtain a predictive medical opinion opining whether plaintiff would have limitations even when sober and, as such, there is likewise no error here. See Cage, 692 F.3d at 126.

Plaintiff also argues that the opinion of Dr. Leveille should not constitute substantial evidence because Dr. Leveille did not review five hundred pages detailing plaintiff's treatment after his October 2010 opinion. [Doc. #21-1 at 17].

However, unlike Dr. Lewis's opinion, Dr. Leveille expressly considered whether plaintiff's drug and alcohol abuse was a contributing factor material to the determination of disability.[6] See Tr. 103-104. Plaintiff does not detail how the five hundred pages of records would alter Dr. Leveille's opinion, but merely states that they would. See Doc. 21-1 at 17. Further, while Dr. Leveille's opinion was composed prior to plaintiff's remission, it is plaintiff who has the burden of proving that drug and alcohol abuse was not a contributing factor to the determination of his disability and, as discussed supra, the ALJ based his characterization of plaintiff's functioning while in remission on substantial evidence.

Lastly, plaintiff argues, "the ALJ did not discuss the weight given to Mr. Wehrhahn's other treating sources." [Doc. #21-1 at 19]. Under the social security regulations, a medical opinion addresses "the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite your impairment(s), and your physical and mental restrictions." 20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2). Plaintiff does not cite any other medical opinion that the ALJ failed to review. The Court notes that there is an additional medical opinion in the record, not cited by

_____

6 Further, substantial evidence supports Dr. Leveille's opinion that plaintiff's drug and alcohol abuse was a contributing factor material to the determination of disability, as discussed throughout this recommended ruling.

plaintiff, signed by Michele Harris, LCSW, and Christine
Desmond, M.D., and dated April 26, 2010. [Tr. 306-11]. This
opinion concludes that plaintiff can maintain employment, social
relationships, and the ability to function effectively on a
daily basis when in a significant period of abstinence from
substance abuse. [Tr. 308].

## C. **The ALJ Based His Findings Regarding Which of Plaintiff's Impairments were Severe on Substantial Evidence and Properly Performed the Combination of Impairments Analysis**

At step two, the ALJ must determine the severity of a
claimant's impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii),
404.1520(c). The ALJ will only consider impairments the claimant
claims to have or about which the claimant provides evidence. 20
C.F.R. § 404.1512(a). An impairment is "severe" if it
significantly limits an individual's ability to perform basic
work activities. SSR 96-3p, 1996 WL 374181, at *1. An impairment
that is "not severe" must only be a slight abnormality that has
a minimal effect on an individual's ability to perform basic
work activities. Id.; SSR 85-28, 1985 WL 56856, at *3.

At step two, if the ALJ finds an impairment is severe, "the
question whether the ALJ characterized any other alleged
impairment as severe or not severe is of little consequence."
Pompa v. Comm'r of Soc. Sec., 73 Fed. Appx. 801, 803 (6th Cir.
2003). "Under the regulations, once the ALJ determines that a
claimant has at least one severe impairment, the ALJ must

consider all impairments, severe and non-severe, in the remaining steps." Id. (citing 20 C.F.R. § 404.1545(e)). Incorrectly applying the step two legal standard is harmless error when some of a claimant's impairments are determined to be severe and others not, so long as those other impairments are considered in subsequent steps. See Reices-Colon v. Astrue, 523 Fed. Appx. 796, 798 (2d Cir. 2013) (summary order).

Here, the ALJ found that plaintiff had two severe impairments: affective disorder and substance abuse disorder. [Tr. 18]. Plaintiff first argues that the ALJ should have specifically listed plaintiff's affective disorders which, according to plaintiff, include bipolar disorder and major depressive disorder. [Doc. #21-1 at 20]. However, the term "affective disorder," which also means "mood disorder," is a general term used to describe major depressive disorder, bipolar disorder, generalized anxiety disorder, and panic disorder, among other disorders. See Healthline, "Types of Affective Disorders," available at: http://www.healthline.com/health/affective-disorders#Types2.

As such, plaintiff's argument that the ALJ did not determine whether plaintiff's panic disorder with agoraphobia and anxiety disorder were severe impairments also fails, as these disorders are included in the severe impairment of "affective disorders." The ALJ's use of the general term

"affective disorders" is appropriate here, where plaintiff's mental health providers provide different perspectives on plaintiff's precise mood disorder diagnoses, including notes that plaintiff may not be bipolar and is not classically depressed. See Tr. 368, 561, 637, 1070-72. Further, the ALJ specifically references plaintiff's diagnoses of "generalized anxiety disorder" and "social phobia," as well as plaintiff's panic attacks, later in his opinion. [Tr. 23, 24]. Even if he considered these impairments to be separate from "affective disorders," and non-severe, he clearly considered them in his analysis and, as such, any error in not specifically delineating the disorders as severe is harmless.

Plaintiff argues that the ALJ failed to determine whether plaintiff's traumatic brain injury, sleep apnea, degenerative joint disease, gout, and chronic joint pain were severe or non-severe, failed to describe their disabling effects, and more generally failed to mention them at all. [Doc. #21-1 at 20-21].

Plaintiff argues that his traumatic brain injury ("TBI") is related to his anxiety, pointing to a single citation that states, "r/o Anxiety d/o due to a Medical Condition (Traumatic brain injury/sleep apnea)." [Tr. 1651]; see also [Doc. #21-1 at 21-22]. A note indicating that it would be helpful to rule out ("r/o") an anxiety disorder ("d/o") due to TBI does not provide a basis for classifying TBI as an impairment [Tr. 1650].

64

Plaintiff provides the same citation for plaintiff's sleep apnea and, as such, the ALJ was not obligated to discuss sleep apnea either.

With regard to plaintiff's other physical impairments, including degenerative joint disease, gout, and chronic joint pain, plaintiff has consistently only claimed psychological impairments and has provided responses that indicate that these conditions are not impairments. During the processing of his initial claim, on September 10, 2010, Carol Graczyk spoke with plaintiff, summarizing her conversation as follows:

> During our conversation, I asked him about his gout and any other physical impairment. Claimant said that this does not bother him now – he has not had a flare of gout and he does not feel that his physical condition causes any work or daily activity limitations at present. He is on medication for this and has had no problems. [Tr. 65].

In his reconsideration filing, plaintiff only alleges "psychiatric problems." [Tr. 88]. Plaintiff's argues that:

> [t]he ALJ's failure to evaluate Mr. Wehrhahn's Gout . . . with chronic joint pain . . . is significant because the pains caused by these ailments would preclude any substantial gainful activity if the pains occur as Mr. Wehrhahn testified . . . and as the pains are described in the medical records. [Doc. #21-1 at 23].

However, plaintiff, when asked about physical limitations, testified that:

> Yeah, I've got a – I take a daily gout medicine. So, I suffer from that for 20 years. That; I've got two bulging discs in my back that bother me from time to

65

time, and not that it's really bothersome right now, but they did an ultrasound on my heart years ago for chest pains, and they said I have two leaky valves, so I don't know what that means, but – but it hasn't bothered me. So, other than that, physical? Not too much.

Further, the Commissioner correctly notes that plaintiff has not submitted any medical opinion assessing limitations resulting from any of these physical impairments. [Doc. #24-1 at 21]. In such a situation, where plaintiff did not claim physical impairments, where no medical opinion supports functional limitations from physical impairments, and where plaintiff has not shown how these physical conditions would change the result in this case, any error by the ALJ in not discussing gout or any other physical impairment is harmless. While the ALJ is generally required to assess both severe and non-severe impairments in his decision and has not mentioned gout or other physical conditions in his decision, the ALJ's error is harmless.

Plaintiff's argument that the ALJ failed to perform a proper combination of impairments analysis also fails, as the ALJ repeatedly referred to the fact that he was aware that he needed to perform such an analysis and that he was completing such an analysis. See Lena v. Astrue, 10-CV-893 (SRU), 2012 WL 171305, at *12 (D. Conn. Jan. 20, 2012); Tr.

15, 16, 17, 21, 22.

**D.   The ALJ Based His Conclusion That Plaintiff Would Not Meet a Listing If Plaintiff Was Not Abusing Drugs or Alcohol on Substantial Evidence**

Plaintiff argues that he meets the requirements of Listing 12.04 by satisfying the requirements of subsections A and B, even when plaintiff is not under the influence of drugs or alcohol. [Doc. #21-1 at 26-30]. Specifically, with regard to these subsections, plaintiff takes issue with the ALJ's characterization of his ability to work part-time, perform activities of daily living, and adequately function socially. Id.

Plaintiff argues that the ALJ's characterization of plaintiff's ability to work part-time is not based on substantial evidence. [Doc. #21-1 at 27]. Plaintiff raised essentially the same argument in a previous section of his memorandum [Doc 21-1 at 13], and it was addressed above in Section A(iii) of this Recommended Ruling.

Plaintiff next argues that the ALJ impermissibly concluded that plaintiff can perform activities of daily living when sober. [Doc. #21-1 at 27-28]. Plaintiff argues that he continued to have suicidal ideation on Memorial Day, for which he was hospitalized. [Doc. #21-1 at 27-28]. While plaintiff was admitted to the VA in May 2011, after allegedly attaining sobriety, the attending physician noted that plaintiff could

likely move to an outpatient setting if his housing and benefits could be addressed. [Tr. 1729]. Even assuming this was a period of decompensation with no relation to substance abuse, such a short period of time is not adequate to meet the temporal requirement set forth in 20 C.F.R. §§ 404.1509, 416.909.

Plaintiff also argues that he required assistance in obtaining his apartment, which he argues would be contrary to the ALJ's assertion that he "moved into his own apartment after securing it himself." [Doc. #21-1 at 28; tr. 26]. However, plaintiff made contacts and visited apartments without assistance as of July 14, 2011 and was noted to have moved in and set up his own utilities on August 24, 2011. [Tr. 1904, 2016]. Plaintiff also cites self-reported anxiety attacks and the ability to get out of bed as evidence of plaintiff's inability to perform activities of daily living but, as discussed above, the ALJ based his conclusion to the contrary on substantial evidence, such as plaintiff performing chores for his girlfriend, working part-time, and securing an apartment. Further, the ALJ relied on Dr. Leveille's opinion, which stated that plaintiff would only have mild restriction in activities of daily living absent substance abuse. See Tr. 93.

Lastly, plaintiff argues that the ALJ incorrectly concluded that his social functioning limitations while sober were moderate. [Tr. 22]. Specifically, plaintiff cites his difficulty

with treating providers, which the ALJ had expressly considered. The only other citations plaintiff provides to support his claim of poor social functioning concern his housing where he did not feel safe. [Doc. #21-2 at 28]. This evidence is insufficient to show that the plaintiff has more than moderate difficulties in social functioning, as it is not the Court's role to re-weigh evidence, and the record provides substantial evidence that plaintiff's social functioning abilities are moderately impaired.

Overall, the ALJ based his decision that plaintiff would not meet Listing 12.04 if he stopped substance abuse on substantial evidence.

**E.   <u>The ALJ Properly Determined Plaintiff's Credibility</u>**

The ALJ is required to assess the credibility of the plaintiff's subjective complaints. 20 C.F.R. § 416.929. Where the claimant's testimony concerning pain and functional limitations is not supported by objective evidence, the ALJ retains the discretion to determine the plaintiff's credibility with regard to disabling pain and other limitations. <u>Marcus v. Califano</u>, 615 F.2d 23, 27 (2d Cir. 1979); <u>Snell v. Apfel</u>, 177 F.3d 128, 135 (2d Cir. 1999).

The courts of the Second Circuit follow a two-step process. The ALJ must first determine whether the record demonstrates that the plaintiff possesses a medically determinable impairment

that could reasonably produce the alleged symptoms. 20 C.F.R. § 416.929(a). Second, the ALJ must assess the credibility of the plaintiff's complaints regarding the intensity of the symptoms. Here, the ALJ must first determine if objective evidence alone supports the plaintiff's complaints; if not, the ALJ must consider other factors laid out at 20 C.F.R. § 416.929(c). See, e.g., Skillman v. Astrue, No. 08-CV-6481, 2010 WL 2541279, at *6 (W.D.N.Y. June 18, 2010]. These factors include: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) any precipitating or aggravating factors; and (4) the type, dosage, effectiveness, and side effects of any medication taken by claimant to alleviate the pain. 20 C.F.R. § 416.929(c)(3)(i)(iv); 20 C.F.R. § 404.929(c)(3)(i)-(iv). The ALJ must consider all the evidence in the case record. SSR 96-7p, 1996 WL 374186, at *5 (Jul. 2, 1996).

Furthermore, in the Second Circuit, the ALJ is required to set forth reasons for his credibility determination with sufficient specificity. See Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988). The credibility finding "must contain specific reasons ... supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements

and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at
*4.

Plaintiff first argues that the ALJ used impermissible
boilerplate language in determining plaintiff's credibility.
[Doc. #21-1 at 30]. So long as the ALJ provided specific reasons
for his credibility determination, the use of boilerplate
language does not justify remand. See Halmers v. Colvin, No. 12-
CV-00208, 2013 WL 5423688, at *7 (D. Conn. Sept. 26, 2013). In
this case, the ALJ provided several reasons for his assessment
of plaintiff's credibility, including plaintiff's receipt of
unemployment benefits for a portion of the time period at issue,
for which he had to certify that he is ready, willing, and
capable of working, [Tr. 18], plaintiff's use of suicidal
ideation as a threat [Tr. 25], and plaintiff's own description
of missing work due to being lazy [Tr. 22].[7] These reasons are
sufficiently specific and based on substantial evidence.

Plaintiff next argues that the ALJ failed to evaluate Mr.

---

7 Many other record citations provide additional support for the ALJ's
credibility assessment. On July 9, 2010, plaintiff expressed concern that his
disability claim would be affected if he were to work. [Tr. 399]. Plaintiff
was described on September 10, 2010, as having a "manipulative quality." [Tr.
958]. In October 2010, despite plaintiff's chronic suicidal thoughts,
clinicians considered him not to be at high risk for suicide. [Tr. 1136].
Plaintiff has been characterized as only being concerned that his "slips" are
reported to authorities. [Tr. 1070]. In October 2010, plaintiff expressed
that he sees benefits to his overreactions, in that they help "get [his]
point across." [Tr. 1016]. Plaintiff expressed desire to participate in part-
time employment, but expressed that he could not go over a specified income
limit of $500 a month. [Tr. 1584-85]. In November 2010, plaintiff described
himself as not having any functional limitations "except in new situations."
[Tr. 1447].

Wehrhahn's "severe and disabling pain." [Doc. #21-1 at 32].

However, the only mention of "pain" in the hearing transcript is a reference to an ultrasound that was performed years ago for "chest pains," and plaintiff's description of cooking as a "pain in the neck." [Tr. 51]. Given that the development of plaintiff's "severe and disabling pain" in the record is nearly as unremarkable as the development in the hearing testimony, the ALJ was not required to evaluate pain.

## F.   The ALJ Based Plaintiff's Residual Functional Capacity on Substantial Evidence and Properly Assessed the Vocational Expert's Testimony

Plaintiff argues that the ALJ gave no basis for the RFC he assigned plaintiff and that the ALJ failed to include the "totality" of the vocational expert's testimony in his decision. [Doc. #21-1 at 32-34].[8] The ALJ concluded that plaintiff, if he were not abusing drugs or alcohol, would be able:

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to jobs involving simple, routine, repetitive tasks with short, simple instructions and few workplace changes, occasional superficial interaction with coworkers, none with the public; attention span to perform simple work tasks for two-hour intervals throughout an eight-hour workday and no high paced production demands or strict adherence to timed production. [Tr. 23].

---

8 Plaintiff also argues that the ALJ did not satisfy his burden of proof regarding jobs that exist for plaintiff's RFC. [Doc. #21-1 at 34-35]. However, plaintiff's argument is an RFC argument, "the RFC that the ALJ used was well beyond Mr. Wehrhahn's abilities." See Doc. 21-1 at 34-35. Plaintiff makes no attempt to argue with specificity any other basis for a challenge to the ALJ's stated conclusions regarding jobs in the economy.

The ALJ's RFC assessment is supported by Dr. Leveille's opinion. Dr. Leveille concluded that plaintiff could perform simple work for two-hour intervals in an eight-hour day with adequate attention. [Tr. 96]. Dr. Leveille also noted that plaintiff would do best in a position away from the public, but that plaintiff could "engage in typical interactions with coworkers and supervisors while completing RRT [routine, repetitive tasks] that does not involve teamwork." Id. Given that substantial evidence supports Dr. Leveille's opinion, that Dr. Lewis's opinion was properly weighed by the ALJ, and that other medical evidence was cited by the ALJ in support of his RFC, as discussed throughout this recommended ruling, the ALJ based his RFC on substantial evidence.

Lastly, plaintiff briefly argues that "the ALJ did not include the totality of the VE's testimony in his decision." [Doc. #21-1 at 34]. Given that the RFC was based on substantial evidence, the ALJ has no obligation to reiterate portions of the vocational expert's testimony that is extraneous and, as such, this argument fails.

### VI.  CONCLUSION

For the reasons stated above, plaintiff's Motion for Order Reversing the Decision of the Commissioner or in the Alternative Motion for Remand for a Hearing [Doc. #21] is DENIED and

defendant's Motion for an Order Affirming the Commissioner's Decision [Doc. #24] is GRANTED.

The Clerk's Office is instructed that if any party files an appeal in this district court following the administrative decision made upon remand, any subsequent appeal initially is to be assigned to this Magistrate Judge, and then to the District Judge who issued the final Ruling that remanded the case.

Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of the receipt of this order. See Fed. R. Civ. P. 72(b)(2). Failure to object within fourteen (14) days may preclude appellate review. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); D. Conn. L. Civ. R. 72.2; Small v. Secretary of H.H.S., 892 F.2d 15 (2d Cir. 1989)(per curiam); F.D.I.C. v. Hillcrest Assoc., 66 F.3d 566, 569 (2d Cir. 1995).

ENTERED at Bridgeport this 6th day of March 2015.

___/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE